[No. 1833.]

## YOUNG PIERCE v. THE STATE.

1. WARRANT — ACCUSATION. — Article 224 of the Penal Code provides that a warrant legally issued, and an indictment or information, or a complaint to a magistrate, are all examples of accusations, and a person proceeded against by either of these is said to be "accused."

2. SAME — RESISTING SERVICE OF A WARRANT. — INDICTMENT for resisting an officer in his attempt to execute a warrant for the arrest of a party accused of a felony, should, in addition to showing that the warrant was sufficient to charge the felony against the party accused, show that the warrant was legally issued.

3. WARRANT OF ARREST may be issued by magistrates: 1. In all cases in which they are by law authorized to order verbally the arrest of an offender. 2. When any person shall make oath before such magistrate that another has committed some offense against the laws of the State. 3. In all cases named in the Code where they are specially authorized to issue such warrants. See article 234 of the Code of Criminal Procedure.

4. SAME — COMPLAINT. — Prescribing the requisites of a complaint, article 236 of the Code of Criminal Procedure provides that, without regard to form, it shall: 1. State the name of the accused, if known, and if not known, must give some reasonably definite description of him. 2. It must state that the accused has committed some offense against the laws of the State, naming the offense, or that the affiant has good reason to believe, and does believe, that the accused has committed such offense. 3. It must state the time and place of the commission of the offense as can be definitely done by the affiant. 4. It must be in writing and signed by the affiant, if he is able to write his name; otherwise he may place his mark at the foot of the complaint. Before a warrant, based upon a complaint made before a magistrate, can legally issue, it must appear that the facts exist which would authorize a verbal arrest, or the facts must present a case in which the magistrate is specially authorized to issue the warrant, or there must be made by some person before a magistrate a complaint charging the commission of an offense, said complaint containing the requisites required in said article 236.

5. SAME. — INDICTMENTS for crime should allege affirmatively and definitely the facts which constitute the offense sought to be charged, and not leave the same to inference.

6. Same — Charge of the Court.— See the opinion *in extenso* for a charge of the court, which, discriminating largely in favor of the defendant, he cannot be heard to complain. Note, also, the charge as a whole commended, and see the statement of the case for the same.

7. Same — Fact Case.— See the opinion, and the statement of the case, for evidence *held* sufficient to sustain a conviction for resisting an officer in the service of a warrant of arrest.

Appeal from the District Court of Hopkins. Tried below before E. W. Terhune, Esq., Special Judge.

The indictment in this case was joint against the appellant and John and Jeff Pierce, and charged them jointly with the offense of resisting an officer in the execution of a warrant of arrest, commanding him to arrest the body of Jeff Pierce. The venue was laid in Hopkins county, Texas, and the offense was alleged to have been committed on the 30th day of June, 1883. The appellant being alone upon trial was convicted, and his punishment was assessed at a term of two years in the penitentiary.

John Becton was the first witness for the State. He testified that since November, 1882, he had held the office of constable of precinct number one of Hopkins county, Texas. At and since the same time W. T. Blythe had been justice of the peace of the same precinct. On the 30th day of June, 1883, the said justice of the peace placed in the hands of the witness, for service, a warrant of arrest for one Jeff Pierce, in which he was charged with the theft of a horse. The witness summoned W. T. Johnson, Harmon Gregg and M. Ikes as a *posse* to aid him in making the arrest. These parties went with the witness, who took the warrant with him. Approaching the house of Frank Pierce, the father of the defendant and Jeff Pierce, the witness and his party saw some persons, including the defendant, but not Jeff Pierce, in the field. Witness told Johnson, Gregg and Ikes that the Pierces knew him as an officer, but did not so know them, and that, therefore, they had best take the warrant and go to the house in a body, while he, the witness, went around the field. Witness gave the warrant to Johnson, who, with Gregg and Ikes, went towards the house, and the witness around the field. As the witness approached the house, having made a circuit of the field, he saw Johnson and Gregg standing in front of the house about fifty yards from it. Jeff and John Pierce were then standing on the gallery, where they were presently joined by the defendant. The three Pierces named were each armed with guns. Witness rode up to Johnson and Gregg and remarked to Jeff Pierce: " That will never do. I have come to arrest you for horse theft,

and have a warrant for you." Jeff Pierce replied: "If you had come alone, or if the sheriff had come for me, I would have surrendered, but as you have brought that G—d d—d law and order with you, I will not be arrested." Witness replied: "I have no law and order with me." Jeff answered: "I know better; Gregg belongs to the law and order." Witness attempted to reason with Jeff Pierce, but with no effect. He, Jeff, insisted that he would never go to jail again, but would die first. Witness promised to guard him and not put him in jail. He replied that he knew better; that he knew that, if the witness got him to Sulphur Springs, he would jail him. Witness then said to him: "Well, then, give me a bond signed by your father, and I will let you alone." Jeff Pierce declined. During this time the three Pierces, defendant, Jeff and John, stood on the gallery with their guns.

About the time that Jeff refused to execute the bond, the defendant left the gallery, taking his gun, and cut across the yard to the horse lot. He caught two horses and went back. As he came off the gallery with the gun, Gregg asked him what kind of a gun he carried. He replied: "Look down the muzzle and see." Gregg then asked him how far it would carry, and he replied: "About a thousand or fifteen hundred yards." The defendant, Jeff and John Pierce then mounted their horses and rode off down the lane. After they left the house they were joined by two other men, who rode off with them. Just before witness and his party started off, which they did as the Pierce party left, the defendant called back that some one had left an umbrella at the house. Johnson went back to the house and got his umbrella. The arrest of Jeff Pierce was not effected. Johnson returned the warrant to the witness before the conversation with Jeff Pierce. Witness had known the Pierce boys for years, and they knew him equally well. Rev. W. R. Billups was at Pierce's house when witness and his party arrived, or got there soon after. He said that he would go in and see if he could not arrange the matter. On his return he advised witness and his party not to enter the house.

On his cross-examination, the witness stated that he had never had official business with the Pierce boys prior to this attempt to arrest Jeff, and he could not say that the defendant knew him to be an officer.

W. T. Johnson was the next witness for the State. He testified that he made the affidavit on which the warrant for the arrest of Jeff Pierce was issued. As a member of the *posse*, the witness accompanied John Becton, constable, and Gregg and Ikes, to make

the arrest of Jeff Pierce, on June 30. When near and before reach-
ing Pierce's house, Becton said that he saw the defendant in a field,
and suggested that, inasmuch as the Pierces knew him as an
officer, it was best that witness, Gregg and Ikes should go direct to
the house, while he, Becton, should approach it from another direc-
tion. Accordingly witness, Gregg and Ikes (witness having the
warrant) rode up to the fence, got down, and went into the yard,
asking for some water as an excuse. While witness was drinking,
Jeff Pierce went from the gallery into the house. Witness heard a
noise of some kind and, drawing his pistol, started around the house.
At a point where two rooms nearly joined, Jeff Pierce met the wit-
ness and threw a gun in witness's face. Jeff told the witness to go
back, and with his party to leave. Witness returned to Gregg and
told him that he and witness had better "get away from there."
Jeff Pierce came out on the gallery armed with a gun, and Frank
Pierce was in the room armed with a gun. Ikes had run off down
the road on foot, and as witness and Gregg had pistols only with
which to oppose the guns, witness thought it was time to leave.
Witness and Gregg left while Jeff Pierce was cursing and ordering
them off. Jeff all the time kept his gun leveled on the witness.
As witness and Gregg went out of the yard, Jeff remarked: "I
have been looking for you fellows, and have been prepared for you."
When witness and Gregg got about fifty yards from the house, they
were joined by Becton, to whom witness returned the warrant.
From this point the witness detailed the occurrences exactly as
they were detailed by the witness Becton, adding that as they rode
off Jeff called out, "Go back and get that man's horse; no one will
hurt you." The party recovered the horse. During the entire con-
versation, Jeff Pierce stood on the gallery with his gun at a pre-
sent. Defendant said nothing until he left the gallery to go to the
lot.

Cross-examined, the witness stated that when he rode up and
asked for water he did not show his warrant nor announce his pur-
pose to make the arrest. Mr. Ikes was the man to whom Jeff Pierce
had traded the alleged stolen horse. Jeff recognized Ikes as the
party approached the house, and remarked: "That is the man now."
When the defendant handed witness the umbrella as witness was
leaving, witness saw that defendant's gun was cocked.

H. Gregg, the next witness for the State, gave substantially the
same account of the occurrences at the house of Pierce as that given
by the witness Johnson.

. The State next introduced in evidence the following affidavit:
"The State of Texas, }
    County of Hopkins. }

"Personally appeared before the undersigned authority, W. F. Johnson, who, after being by me duly sworn, deposes and says that Jeff Pierce, in the county of Hopkins, and State of Texas, on or about the 10th day of November, 1882, did then and there fraudulently steal, take and carry away from and out of the possession of S. W. Bryarly, without his consent, one certain horse, the corporeal personal property of S. W. Bryarly, with the intent then and there to deprive the said owner thereof, of the value of said property, and with the intent then and there to appropriate the same to the use and benefit of him the said Jeff Pierce; contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State.

                                        "W. T. Johnson."

"Sworn to and subscribed before me this 30th day of June, 1883.
                                        "W. T. Blythe, J. P."

The State next introduced in evidence the following warrant:
"The State of Texas, }
    Hopkins County. }

"To the Sheriff or any Constable of Hopkins County, Greeting: You are hereby commanded to arrest the bod— of Jeff Pierce, and him safely keep, so that you have him at my office in Sulphur Springs instanter, then and there to answer the State of Texas on a charge of theft of a horse, founded on affidavit of W. T. Johnson. Herein fail not, and due return make.

"Given under my hand the 30th day of June, 1883.
                              "W. T. Blythe, J. P. Hopkins Co., Texas."

At this point the State closed.

Frank Pierce, the father of the defendant and John and Jeff Pierce, was the first witness for the defense. He testified that he was at home, with Jeff and John, when Johnson, Gregg and Ikes came up to the house. He was, at the time, in the house sweeping the floor. He saw his son Jeff run through the house with a gun in his hand. He asked Jeff the occasion of such action. Jeff replied: "A lot of fellows have come here with pistols. They don't say what they want, and I am going to make them get out." Johnson and Gregg got out of the gate at quite a lively gait. Ikes, the Denison man, kept going, and the witness has not seen him since. Jeff Pierce stood on the gallery, with one foot up and the

gun resting across his leg. John Pierce was on the steps with a pistol. Witness was not armed, and the defendant was not present. Becton had not come up when Jeff ordered the party off. When Johnson and Gregg got off about one hundred and fifty yards from the house, the defendant, who had been in the cotton field, came up to the house. Defendant had that morning promised his wife to come to the house that evening, to go with her to his, defendant's, brother-in-law, Hopkins's, house to borrow his, Hopkins's, gun to use in a proposed "drive." It was also his purpose, as agreed between him and his wife, to take an old cartridge rifle to Hopkins's to fit with cartridges, if possible. This old cartridge rifle had not been loaded for six months, and no cartridges large enough for it could be found in that section of the country. It had been lying loose around the house. John and Jeff Pierce were standing on the gallery with their weapons, talking to the men, when the defendant came up. Defendant asked: "What does all this mean?" Jeff replied: "That d——d mob have come here without saying what for, and I made them leave." The defendant then took up the old gun, carried it with him to the lot, saddled two horses, and he and his wife rode off towards Mr. Hopkins's. This was a few minutes after John and Jeff left. Defendant before leaving told the party that some one had left an umbrella, and to come and get it. John and Jeff were joined in the lane by two men, and the four rode on together. The witness did not know who the two men were. Defendant and his wife returned home that night with Hopkins's gun. At the time of this trouble there were but two guns and one pistol on the witness's place.

Cross-examined, the witness stated that he heard Jeff Pierce tell Becton that he would never go to jail again alive. He told Becton that he would have gone with him, Becton, alone, or with the sheriff, but would never go with that "d——d law and order mob."

John Pierce testified, for the defense, that he was at home when Johnson and Gregg arrived. The two men named came in, asked for water, and Johnson as he was drinking drew his pistol. Jeff went into the house and got his gun. Johnson went around the house, but soon came back. Jeff came back to the front and remarked: "That d——d mob came here with their pistols and don't say what they want." Witness got a pistol. Jeff ordered the party off and they left. Ikes ran off entirely, and Johnson and Gregg retired to a point about one hundred and fifty yards distant, where they were joined by Becton. Jeff and Becton had a good deal to say to each other. About this time the defendant came up to the

house to go with his wife to Hopkins's house to borrow a gun, according to their previous arrangement. Defendant took up an old fifty-six caliber rifle and went with it to the lot, where he caught two horses. Johnson and Gregg started off when Jeff Pierce told them to " take that man's horse," which they did. Defendant told them they had left an umbrella, and one of them came back and got it. The old rifle spoken of had not been loaded for six months, and there were no cartridges on the place large enough for it. Witness and Jeff Pierce left the house together. Johnson and Gregg did not, when they arrived at the house, say what they came for. Witness heard Jeff tell Becton that he, Jeff, would not go to jail alive. Witness, when accorded a verdict of not guilty, by the district attorney, was not asked if he had a gun or pistol at the time of the controversy.

John Becton, in rebuttal, testified for the State that the defendant and his wife did not leave Pierce's house together. The defendant left with or just after Jeff and John did. Two women left the house just as the witness rode up to it, and did not come back again. Witness did not know these women, but supposed one was the wife of the defendant. He saw no women about the place afterwards.

The charge of the trial judge, commended by this court, reads as follows:

" *Gentlemen of the jury:* I charge you that our Penal Code provides:

"I. If any person shall wilfully oppose or resist an officer in executing or attempting to execute any lawful warrant, for the arrest of another person, in a case of felony, he shall be punished by confinement in the penitentiary for a term not less than two nor more than five years.

"II. A constable is an officer as contemplated by the above provision of the statute. The warrant in evidence is such a writ as would authorize a constable to execute it in arresting the party named in the warrant.

"III. When a constable goes to make an arrest he has the power to summon others as a *posse* to assist him, and if such person consent to assist in such arrest, and undertake to aid in the execution of the warrant of arrest, such person shall be bound to do so under all the penalties to which the constable would be liable, and would have the same rights and be governed by the same rules as the constable himself. If, therefore, the jury believe from the evidence that John Becton was, on the 30th day of June, 1883, constable of

precinct number one of Hopkins county, Texas, and that he had a warrant for the arrest of Jeff Pierce, charging him with the offense of theft of a horse, and that he summoned Harmon Gregg and W. T. Johnson to go with him to assist in making such arrest, and they consented to go, and did undertake with John Becton to make such arrest, then they would have been bound to do so, and would have the same rights and be governed by the same rules as the constable himself.

"IV. When an officer has a warrant of arrest in his hands for execution, it is his duty to execute it at once, and in executing the warrant he shall make known to the party accused under what authority the arrest is made, and if requested the warrant shall be exhibited to him, but unless the person for whose arrest the warrant is issued requests to see the warrant, the officer need not exhibit it. And if the person for whom the warrant is issued knows that he is sought to be arrested, and on what charge, then it is not necessary for the officer to make known to such party under what authority he is making such arrest.

" V. All persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one or more persons, but others are present, and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, such persons so aiding or encouraging are principal offenders, and may be prosecuted and convicted as such.

" VI. The jury in determining the guilt or innocence of the defendant Young Pierce, who alone is on trial, shall not consider the acts, declarations and conduct of Jeff Pierce, John Pierce or any one else, unless the defendant Young Pierce was present, and if the jury believe, while Young Pierce was present, that Jeff Pierce, John Pierce, or either of them, did any act in the commission of the offense charged in the indictment, and that Young Pierce was present and, knowing the intent of Jeff Pierce or John Pierce, aided them by act or encouraged them by words or gestures, he would be equally guilty with them, and the act or declaration of those whom Young Pierce, knowing the unlawful intent, aided or encouraged as above stated, would be the act or declaration in law of Young Pierce. But unless the evidence shows that Young Pierce was present, and, knowing the unlawful intent, did aid by acts, or encourage by words or gestures, Jeff Pierce or John Pierce, then the jury should not consider any act or declaration of Jeff Pierce or John Pierce as evidence against this defendant.

"VII. If, therefore, the jury believe from the evidence that John Becton, at any time in three years, before August 28, 1883, was constable of Hopkins county, Texas, and that he had the warrant in evidence, for the arrest of Jeff Pierce for theft of a horse, in his hands for execution, and that he summoned Harmon Gregg and W. T. Johnson to go with him in making such arrest, and that they did go with him and attempt with him to execute such warrant, and that John Becton, Gregg or Johnson made known to Jeff Pierce their authority for his arrest, or that he knew their authority, and for what purpose they desired to arrest him, and that Young Pierce was present and by himself, or acting with Jeff Pierce and John Pierce or either of them, wilfully opposed or resisted said Becton or Gregg or Johnson in executing said warrant, or that Jeff Pierce, or Jeff Pierce and John Pierce, resisted said officer or officers as hereinbefore defined, and that the defendant was present, and encouraged them, or either of them, by words or gestures, or aided them by acts, knowing their unlawful intent, the defendant would be guilty, and his punishment would be confinement in the penitentiary for a term of not less than two nor more than five years.

"VIII. As to what constitutes an opposition to the execution of a warrant or resistance of an officer, the jury are charged that any act wilfully done with intent to deter or prevent any officer from the performance of his duty, and prevent him in making the arrest, would come within the meaning of the statute. If the means used is sufficient to prevent the officer in making the arrest, through fear, terror or otherwise, caused by the opposition or resistance, it would make the offense complete if it had the other elements hereinafter charged upon.

"IX. An officer with a warrant of arrest for horse theft can go to any place to make the arrest, and, after giving notice of his authority and purpose, can go into any house and break down a door if necessary.

"X. In all criminal cases the defendant is presumed innocent, until proved guilty by legal evidence, and in case of a reasonable doubt as to his guilt, is entitled to an acquittal.

"XI. The jury are the exclusive judges of the weight of evidence and the credibility of witnesses.

"XII. Horse theft, in law, is a felony."

(Signed)           "E. W. Terhune, Special Judge."

The motion for new trial assailed the charge of the court as given, and the action of the court in refusing charges asked, the refusal of a continuance, and the sufficiency of the evidence to support the verdict.

*B. W. Foster* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant, Young Pierce, was prosecuted to conviction for wilfully opposing and resisting an officer in attempting to execute a lawful warrant for the arrest of Jeff Pierce, his brother. It appears from the indictment that Jeff Pierce was charged with theft of a horse,— a felony. The resistance is charged to have been made by the use of arms, to wit, shot-guns and pistols.

Appellant moved to quash the indictment because it failed to allege definitely and affirmatively that Jeff Pierce was accused or charged with a felony. Upon this matter the indictment alleges that one W. T. Blythe, being then and there a justice of the peace, as such justice "then and there, on the 3d day of June, 1883, issued a certain warrant directed to the sheriff or any constable of Hopkins county, and which said warrant was in words and figures following, that is to say: ' The State of Texas, Hopkins county. To the sheriff or any constable of Hopkins county, greeting. You are hereby commanded to arrest the body of Jeff Pierce, and him safely keep, so that you have him at my office in Sulphur Springs, instanter, then and there to answer the State of Texas on a charge of theft of a horse, founded on the affidavit of W. L. Johnson,' " etc.

Article 224, Penal Code, provides that a warrant legally issued, an indictment or an information, or a complaint to a magistrate, are all examples of *accusations,* and that a person proceeded against by either of these is said to be *accused.*

Now, while it is true that a warrant which sets out the accusation, if copied in and made a part of the indictment, as in this case, may be a sufficient affirmative allegation or averment of the fact that Jeff Pierce was charged with felony, the writer is of the opinion that, for it to be so, the science and logic of criminal pleading require that the indictment must allege facts which clearly show that the warrant issued legally.

When may a magistrate issue warrants of arrest? This we learn from article 234, Code Criminal Procedure. "Magistrates may issue warrants of arrest in the following cases:

"1st. In all cases in which they are by law authorized to order verbally the arrest of an offender."

" 2d. When any person shall make oath before such magistrate that another has committed some offense against the laws of the State."

" 3d. In all cases named in this Code where they are specially authorized to issue such warrants."

Art. 235. "The affidavit made before the magistrate, which charges the commission of an offense, is called a complaint." And by article 236 the complaint, to justify the issuance of the warrant of arrest, without regard to form, "must state the name of the accused, if known, and if not known must give some reasonably definite description of him."

2. "It must state that the accused has committed some offense against the laws of the State, naming the offense, or that the affiant has good reason to believe, and does believe, that the accused has committed such offense."

3. "It must state the time and place of the commission of the offense, as definitely as can be done by the affiant."

4. "It must be in writing, and signed by the affiant, if he is able to write his name; otherwise he may place his mark at the foot of the complaint."

It is clear upon principle, to the writer, that before the warrant can be legally issued the facts must exist which would authorize a verbal arrest; or the facts must present a case in which the magistrate is *specially* authorized to issue the warrant; or there must be made by some person, before a magistrate, a complaint charging the commission of an offense, said complaint containing the requisites required in article 236, Code Criminal Procedure. And if therein existed facts which authorized a verbal arrest, or which presented a case in which the magistrate was specially authorized to issue the warrant of arrest, the indictment must set out these facts. Why must this be done? Because by the very terms of the article of the Code (219) under which appellant stands convicted, the warrant must be a lawful warrant. This does not mean merely that the warrant must be in lawful form, but that it must have been lawfully issued.

But it may be urged by the State that the indictment alleges that a complaint was made by W. L. Johnson, and that said complaint was, and *appears from the indictment,* sufficient authority for the lawful issuance of the warrant of arrest. Upon this subject, what is the allegation in the indictment? All bearing upon this subject is contained in the warrant, and is as follows: "Then and there to answer the State of Texas on a charge of theft of a horse, *founded on the affidavit of W. L. Johnson.*" Before whom did Johnson make affidavit or complaint? Who was charged in said complaint with the commission of an offense against the laws of the State, and of what offense was he charged by said complaint? Was said complaint in substance such as authorized the magistrate to issue

the warrant of arrest? To answer these questions favorably to the sufficiency of the indictment, we are driven to inferences and presumptions not to be tolerated in indictments; it being a well settled rule that when the guilt of a citizen depends upon the existence of facts, the facts must be alleged directly and affirmatively, and not be left to inferences.

I have given my views upon the question briefly, from which would result the conclusion that the indictment, upon the ground above indicated, is bad; but, testing the indictment by the great weight of authority, we must hold it, so far as this objection is concerned, sufficient.

Appellant objects to the charge of the court because there is no mention of arms contained therein. If the resistance is made without arms, in case of felony, the punishment is not less than two nor more than five years. If with arms, not less than two nor more than seven years. In this case evidently arms were used, and the learned judge could have very properly charged the jury that, if the resistance was made by the use of arms, the punishment should not be less than two nor more than seven years. This, however, was not done, his honor below preferring the milder punishment, and hence the jury were confined by the charge to two and not less than five years' punishment. Of this, certainly, appellant cannot complain. Before leaving the charge of the court, we desire to observe in relation thereto that, as applicable to the charge contained in the indictment, and the facts — each and every phase of the facts — this charge is an admirable statement of the law. It is clear, correct, concise and easy of comprehension.

Is the verdict sustained by the evidence? Becton, the constable, testified that when he went to the house, Jeff Pierce and John Pierce were on the gallery, and that in a moment Young Pierce (appellant) came out on the gallery. They all had guns. He told Jeff Pierce that would never do; that he came to arrest him on a charge of theft of a horse, and had a warrant for him. That Jeff replied, among other things, that he would never go to jail again; that he would die first. During this conversation they were standing on the gallery with their guns. That appellant left the gallery for the horse lot to catch a horse, but carried his gun with him. As he passed Gregg, he was asked what kind of a gun that was. He replied, "Look down the muzzle and see." Gregg then asked him how far it would shoot. He replied, "A thousand or fifteen hundred yards." After this, Jeff, John and appellant got on their horses and rode off down the lane.

This evidence discloses that, in the presence of appellant, Jeff Pierce was informed by the constable that he was charged with theft of a horse; and that he, the constable, had a warrant for his arrest for this offense; and that it was his intention to execute the warrant by arresting him. That Jeff refused to be arrested, and was determined not to be arrested, being furnished with deadly weapons to prevent the same. And that during all that occurred between the constable and Jeff Pierce, appellant was present and armed with a gun. It is true that he took no part in the conversation between the constable and Jeff, and it may also be true that his gun was not loaded; still it does not follow that his acts, under the surrounding circumstances, were not intended as aid to his brother in resisting the arrest. They certainly were calculated to encourage him in his resistance, and were, no doubt, calculated to induce the constable to believe that, if he attempted the arrest of Jeff, he would certainly have appellant, as well as Jeff, to overpower before he could accomplish the arrest of Jeff. That appellant was present, armed with a gun for the purpose of giving aid and encouragement to his brother, or overawing the constable, is strongly corroborated by the fact that he carried the gun with him to the lot, and that they all left together, etc.

We have given the evidence a most thorough examination, and do not feel that the verdict of the jury should be disturbed, especially when viewed in the light of the charge of the court. For it was a very clear statement of the law, not only to the case as a whole, but especially so with relation to every phase of the case which tended to the innocence, or called in question the guilt of the appellant.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

[Opinion delivered November 29, 1884.]